UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER:  0:20-cv-60678

MELISSA LOPEZ,

       Plaintiff,

v.

THE CITY OF MIAMI, a municipality, and
JAVIER ORTIZ, in his individual capacity,

       Defendants.
_____ /

**COMPLAINT FOR DAMAGES**
**(JURY TRIAL DEMANDED)**

DAVID A. FRANKEL
Law Offices of David A. Frankel, P.A.
Attorneys for Plaintiff
4601 Sheridan Street, Suite 213
Hollywood, FL  33021
(954) 683-0300
FLA. BAR NO.  741779
David@BlueLotusLaw.com
eService@BlueLotusLaw.com

COMES NOW the Plaintiff, MELISSA LOPEZ, and sues Defendants, CITY OF MIAMI, and JAVIER ORTIZ, demands trial by jury, and alleges:

## NATURE OF THE ACTION

1.      This is an action for damages arising from an unlawful use of force by City of Miami Police Officer JAVIER ORTIZ, intended to cause serious bodily injury and emotional distress, that occurred on or about December 9, 2017 after the Plaintiff, MELISSA LOPEZ, was assaulted and battered by JAVIER ORTIZ.  The action claims that ORTIZ'S malfeasance was the direct result of an adopted policy, practice, or custom of the CITY OF MIAMI intended to tolerate all manner, and any type of, written departmental policy or civil rights or law violations by ORTIZ. This action alleges violations of federal civil rights laws, 42 U.S.C. §1983, and the laws of the State of Florida. The Plaintiff seeks in excess of SEVENTY-FIVE THOUSAND ($75,000.00) DOLLARS in damages, exclusive of interest and costs.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§1983 and 1988, the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the tort laws of Florida.  Jurisdiction is founded on 28 U.S.C. §§1331, 1343, 42 U.S.C. §1988, and under the tort law of Florida.  Supplemental jurisdiction, and joinder of parties for additional state law claims, is proper pursuant to 28 U.S.C. §1367(a), because they form part of the same case or controversy.  The Plaintiff asserts multiple state tort law claims.

3.      Under 28 U.S.C. §1391(b)(2), venue lies in the United States District Court for the Southern District of Florida, Miami Division, because it is the judicial district and

division in which a substantial part of the events or omissions giving rise to the claims occurred.

## PARTIES

4.     The Plaintiff, MELISSA LOPEZ (hereinafter "LOPEZ"), at all times material hereto, has been a resident of Palm Beach County, Florida, over the age of 18 years, and otherwise able to sue in her own capacity.

5.     The Defendant, CITY OF MIAMI (hereinafter "CITY") is a political subdivision of the State of Florida, a Florida municipal corporation. Defendant City was responsible for the hiring, retention, training, supervision, discipline, and conduct of the Defendant, Javier Ortiz, as he was employed by the CITY's Police Department at all relevant times.

6.     The Defendant, JAVIER ORTIZ (hereinafter "ORTIZ"), Badge #5418, is a duly appointed law enforcement officer of the City of Miami Police Department, at all times material hereto acting under color of law, to wit: under the color of statutes, ordinances, regulations, policies, practices, customs and usages of the City of Miami Police Department, and/or the State of Florida. Defendant ORTIZ is being sued in his individual capacity.

## GENERAL ALLEGATIONS

7.     Once again, to satisfy his own violent impulses, ORTIZ has attacked a citizen causing serious bodily injury, and then made an arrest to cover it up.

8.     This time it was a 29-year-old female, a pharmacist, attending the Art Basal Festival with her boyfriend.

9.      As he has in at least four dozen other incidents, ORTIZ relied on the comfort and knowledge furnished to him by the CITY and its police department, that he can violate policies, constitutional rights, and state laws of any type without repercussion, discipline, or termination.

10.     Until recently, when he was suspended for lying on a promotion application claiming he was African American[1], ORTIZ controlled the City of Miami Police off-duty detail assignment program, giving him the ability to assign himself to any detail he prefers.[2] Evident from his history of abuse, ORTIZ uses that prerogative to assign himself to large events; music and street festivals, and entertainment and dining complexes, where crowds will be gathered.  At these gatherings ORTIZ intimidates, threatens, and physically assaults people.

11.     In 2012, ORTIZ and other officers under his supervision at the Ultra Music Festival beat and kicked a man while he was on the ground in a fetal position.  The attack was so severe that an uninvolved citizen, a woman special-education teacher, Vanessa Radice, jumped into the melee to save the man because, as she later testified, she was "afraid for the guy's life."  To cover up the assault, ORTIZ ordered the man, Jesse Compandonico, to be arrested.  However, the charges were later dropped when the Miami-Dade State Attorney's Office issued a memorandum indicating ORTIZ falsified the use of force report (Response to Resistance Report).  The CITY later settled a federal lawsuit

---

[1] Jerry Iannelli, *All the Times Miami Cop Javier Ortiz Insulted Black People*, Miami New Times, January 26, 2020.

[2]  According to a report submitted by Chief of Police Jorge Colina to the City of Miami Commission, ORTIZ is currently under civil and criminal investigations by the Miami-Dade State Attorney's Office and the Florida Department of Law Enforcement for improprieties related to his control of the off-duty program, as well as for his pattern of excessive use of force and false arrests.

paying Mr. Compandonico $450,000.  ORTIZ was banned from the Ultra Music Festival by its promotors.  But no disciplinary action against ORTIZ was taken by the CITY.

12.    In February, 2011, ORTIZ dragged Cyril Mohandes down a stairway by the neck at the CocoWalk complex and then arrested him for trespass because Mr. Mohandis was video recording ORTIZ abusing another citizen.  Mr. Mohandis told Miami Internal Affairs ("IA") that while ORTIZ was dragging him, ORTIZ stated "My Internal Affairs record is very long, and it doesn't matter if you make a complaint."  ORTIZ was right. Despite the credibility of Mr. Mohandis' report (how would he know that ORTIZ had a long IA record unless ORTIZ said it), his complaint was declared to be "inconclusive."

13.    In May, 2012, ORTIZ shut down an entire road work project, threatening the project manager, Randy Stringer, with arrest simply because a DOT work truck was blocking his access to the Fraternal Order of Police building where ORTIZ was president. Officials from the Florida Department of Transportation filed an IA complaint.  The project was properly permitted, and despite the clear abuse of authority and violations of police policies, IA determined the allegations as "inconclusive."

14.    In February, 2011, ORTIZ assaulted a mother, Sunya Stafford, and her two sons when he noticed an employee checking one son's driver's license at CocoWalk.  The employee, a bouncer, later told IA investigators that there was no trouble until ORTIZ showed up.  ORTIZ grabbed Stafford's son, Calvin, by the shirt, pushing him to the ground (the young man was on crutches), and slammed the other son into a car when he tried to video record ORTIZ'S assault of his brother.  ORTIZ took the cellphone and when it was later returned, the recording was erased. IA interviewed the bouncer and independent witnesses, Ms. Lizbeth Salgado and Edwin Goodwin -- all of whom supported Ms.

Stafford's account -- and interviewed several officers present who contradicted ORTIZ'S statement of the facts.  Nonetheless, IA found the allegations "inconclusive."

15.  In June, 2013, ORTIZ was working the off-duty detail outside the American Airlines Arena after the Miami Heat won the NBA Championship. Videos and photographs show ORTIZ and other officers attacking Francois Alexander and a young woman.  Mr. Alexander was beaten so badly he was taken to Miami-Jackson Medical Center after he was arrested for inciting a riot.  The incident was widely reported in the media; however, the CITY took no action against ORTIZ.[3]

16.  On December 5, 2017, five days before ORTIZ attacked Plaintiff LOPEZ, he arrived at the roadside stop of a young couple (no one had requested his presence). When ORTIZ became verbally abusive and threatening, Thamara Cazeau, the girlfriend of the driver, Polini Sanon, began to video record the interaction. To intimidate Ms. Cazeau, ORTIZ took her driver's license and work I.D. and began photographing them, suggesting he could affect her employment.  Mr. Sanon and Ms. Cazeau filed complaints with Miami's IA focusing on ORTIZ'S photographing of the identification and intimidation of Ms. Cazeau.  The couple produced a video which clearly shows ORTIZ using his cellphone to photograph items place on the hood of his vehicle.  When interviewed, ORTIZ stated that he only looked at a piece of paper from Ms. Cazeau's wallet but never photographed anything.

> "Did you take out your cell phone — or do you have a cell phone that you normally carry with you while you're on patrol?"

---

[3] Jerry Iannelli, *Miami Police Union Chief Javier Ortiz Sued for Allegedly Beating Man During Miami Heat Championship Celebration*, Miami New Times, September 2, 2016.

"Yes."

"At any point in time, did you take any photographs of any items on-scene?"

"No."

"Did you take any pictures in reference to identification cards?"

"No, but I did take note that she works for the University of Miami medical campus and I run police services at the University of Miami," ORTIZ said.

ORTIZ'S sworn statement was also contradicted by another officer present.  ORTIZ said that he was summoned to the scene because Polini was argumentative.  The other officer disputed that account saying that a supervisor was never summoned and Polini was polite the entire time.

17.   The conclusion of the IA investigation report itself misrepresented the account of the other officer, falsely stating the officer supported ORTIZ'S account. The report determined that the allegations were "Inconclusive" because, "There are no independent witnesses and/or video footage to either prove or disprove the allegation." See Meg O'Conner, *Botched Javier Ortiz Investigation Exemplified Internal Affairs' History of Incompetence and Coverups*, Miami New Times, Nov. 15, 2018.

18.   In October, 2014, Attorney Alan Diamond, General Counsel for the Florida FOP, filed an IA complaint against ORTIZ claiming that he unlawfully accessed the Florida Driver and Vehicle Information Database (a secure law enforcement database) in an effort to obtain Mr. Diamond's personal information to use for retaliation related to a FOP matter.  In his statement to IA, ORTIZ admitted committing the crime, and further stated that he directed a subordinate, Officer Nikilai

Trifonov, to access the database for him to conceal his participation.  IA determined the complaint as "Substantiated."  Use of the D.A.V.I.D. System for unauthorized, non-official use is a crime in Florida and violation of Department Policy Rule 14, Section 2, resulting in Dismissal, Suspensions and/or Demotions.  None of these disciplines were imposed on ORTIZ.

19.  In April, 2010, Ms. Karissa Soto was at CocoWalk with her husband and friends.  ORTIZ overheard Ms. Soto telling a server that her "souvenir cup" was mistakenly cleared from the table.  When Ms. Soto went to retrieve the cup from the trash, ORTIZ followed her, yelled "Watch where the hell you are going," and pushed her down an escalator.  The Sotos filed an IA complaint and provided statements as to what had occurred; however, the IA determination was "inconclusive."

20.     In November, 2009, Mr. Carlos Sosa was nearly struck while driving in the City by Officer Edward Lugo, a close friend of ORTIZ.  Officer Armando Alverez was a passenger in the vehicle driven by Lugo.  The two officers were fellow FOP members transporting people to the voting poles.  The van was branded with a political sign for Mayor Tomas Regalado.  Lugo yelled out at Mr. Sosa, "You don't know who you are fucking with."  Both vehicles stopped and Lugo got out and pushed Sosa.  Alverez contacted communications and Sergeant ORTIZ showed up.  He arrested Mr. Sosa alleging that Sosa threw a bottle at an officer (the bottle could not be found according to ORTIZ) and charged him with Battery on a Law Enforcement Officer.  Ms. Idania Garcia, Mr. Sosa's girlfriend who was present, confirmed in an interview that the van almost struck their car whereupon one or both of the officers "gave them the finger" and one yelling "*motherfuckers.*"  Upon exiting the van, Alverez told Sosa

he was a police officer and pushed Sosa three times.  Ms. Garcia called 911 to report the incident and later obtained a copy of the recording.

21.     On July 20, 2010, Mr. Sosa's case went to trial.  While in the courthouse, Officer Lugo and Sergeant ORTIZ began harassing Sosa, telling him he was not going home and his "ass is going to jail."  The officers began to pretend cry and "moon-walk" across the floor, mocking Mr. Sosa.  This was witnessed by Mr. Sosa's attorney, Jaclyn Botts.  Ms. Garcia was also present for the trial and was in the hallway when the two officers began making lewd remarks, telling her she "*had a nice body,"* and they "*could take care of her."*  The officers' behavior became so disruptive that Ms. Botts, the defense attorney, notified the judge, who reprimanded Lugo and Ortiz, banning them from the courtroom.

22.     At the trial, the *defense* produced a copy of the 911 tape which, based on ORTIZ'S representation to the prosecutor, was misplaced and unavailable.

23.     After the jury acquitted Mr. Sosa, Ms. Botts was leaving the courthouse when she was assaulted by ORTIZ and Lugo who swerved their CITY police car at her as she was stepping off the sidewalk, yelling, "You got us this time, we'll get you next time."

24.     Mr. Sosa and Ms. Garcia filed a complaint with IA, providing the name of her attorney and the case information so a transcript could be obtained.  Despite there being no bottle retrieved as evidence, despite claiming Ms. Garcia's 911 recording was lost, and despite the acquittal, the IA investigation resulted in a determination of "inconclusive" because there were no independent witnesses.  The IA investigator stated in the report he could not locate Ms. Botts, who later told the Civilian

Investigative Panel that she is a registered member of the bar and has had the same telephone number as the one furnished to IA for many years.

25.     In April, 2008, ORTIZ grabbed Ms. Alesha Bruce's purse and threw her down to the ground.  Ms. Bruce filed an IA complaint; however, no investigation was ever conducted and the matter was closed with no finding.

26.     In January, 2009, Mr. Jonathan Vilma was driving to Miami International Airport to pick up a friend.  He was pulled over by ORTIZ who became irate when Mr. Vilma questioned why he was being stopped.  Mr. Vilma was arrested and charged with Resisting an Officer with Violence and Reckless Driving.  Mr. Vilma at the time was a player in the National Football League and the incident drew nationwide attention which was known to CITY officials.  Mr. Vilma was quoted in local newspapers and television describing ORTIZ'S wild behavior.  In turn, based on the speciousness of the evidence and ORTIZ'S lack of credibility, the Miami-Dade State Attorney's Office refused to prosecute the case.  The CITY, however, made no effort to investigate ORTIZ'S conduct.

27.     In July, 2010, Ms. Cynthia Bettner took her 12-year-old daughter to a children's movie at the CocoWalk theaters in Coconut Grove.  Ms. Bettner had previously worked as the marketing director for CocoWalk and was doing marketing for some of the vendors in the complex.  Ms. Bettner lives in the Grove.  As she and her daughter were leaving the theater, ORTIZ began to follow her for no explicable reason.  She eventually confronted ORTIZ, telling him he was scaring her and her daughter.  At that point, ORTIZ advised her she was trespassing.  When she protested, ORTIZ replied, "Do you have any more shit to say?" and placed her under arrest and

10

placed handcuffs on her very tightly.  Following the arrest, ORTIZ physically threw Ms. Bettner into a parked vehicle with so much force it caused a dent.  While she was on the ground, her 12-year old daughter jumped on the back of ORTIZ trying to save her mother.  She was charged with Trespass, Resisting an Officer Without Violence (two counts), and Disorderly Intoxication.  Although this all occurred in front of Ms. Bettner's 12-year old daughter, ORTIZ failed to follow Departmental procedure Order 9 Chapter 2§2.4 requiring that he notify Dept. of Children and Families and the City of Miami Child Abuse Unit.

28.     Ms. Bettner filed an IA complaint but then withdrew it stating that Sergeant ORTIZ contacted her and told her, "I know what you are doing."  On November 3, 2010, an IA investigator called Ms. Bettner to take her statement.  She told the investigator that she had been threatened and wanted to withdraw the complaint for fear of retaliation from ORTIZ.  IA closed the investigation without any further effort to investigate the alleged threat.

29.     In April, 2009, Ms. Rebecca Beltran was eight months pregnant and driving her car to her accountant's office.  She was experiencing heartburn related to the pregnancy and was driving slowly.  The driver behind her became irate and began honking.  Ms. Beltran signaled for the driver to pass her; instead, he stayed on her tail, driving aggressively, trying to frighten her.  The driver was Javier ORTIZ, who activated the lights of his car and pulled her over.  In fear, Ms. Beltran called her father asking him to stay on the phone for her protection.  ORTIZ used abusive language toward Ms. Beltran.  He then wrote her several citations that were fabricated.  Ms. Beltran filed an IA complaint; however, no investigation was conducted at all.

30.     In January, 2016, Ms. Claudio Castillo flagged over a police officer who was driving on Miller Road at 90 mph.  When he came to her window, Ms. Castillo told the officer, "The reason I pulled you over today and I'm asking you to come over and have a conversation is because I saw you since Miller Drive when you first jumped onto the Palmetto and you were pushing 90 miles per hour." The entire incident, including the officer's driving pattern and the roadside encounter, were video recorded by Ms. Castillo.  She posted the video (available on multiple media websites).  At the roadside, the officer actually apologized to Ms. Castillo and promised to slow down.

31.     In retaliation, ORTIZ "Doxxed Ms. Castillo,[4] using his social media platform as President the FOP, posting Castillo's Facebook photos and phone number and urging his social media followers to call her.  Castillo received hundreds of threatening phone calls and Facebook messages, and Facebook itself removed the posts for being abusive.  IA investigators agreed with Castillo that ORTIZ had committed cyberbullying and violated departmental rules.  Investigators substantiated complaints of improper procedure and discourtesy against ORTIZ, finding him in violation of rules that are "grounds for dismissal, suspension, and demotion."  But, IA's final report indicates ORTIZ received only a reprimand.[5]

32.     In response to a request for comment, ORTIZ wrote, "This woman is a danger to my members and law enforcement as a whole ... .  She's an officer safety risk

---

[4] Publishing private or identifying information about an individual on the Internet with malicious intent.

[5] Jessica Lipscomb, *Miami Police Union Chief Javier Ortiz Reprimanded for Doxxing Private Citizen*, Miami New Times, December 21, 2016.

pulling over a vehicle on the side of I-95," he says in a text message.  In March of 2017, Ms. Castillo sought and was granted a restraining order against ORTIZ by a Miami-Dade Judge.  In October of that year, he was promoted to Captain.

33.     In July, 2015, ORTIZ, while off duty, responded to a roadside traffic stop of Mr. Ruben Sebastian.  ORTIZ eventually pulled him from the car and placed him in handcuffs.  The handcuffs were forced down so hard, Mr. Sebastian lost all feeling in his hands.  When he complained, ORTIZ responded by telling him, "If you don't like it, I know how to make them tighter."  ORTIZ then falsely arrested Mr. Sebastian for reckless display of a firearm.  The charges were dropped when ORTIZ refused to cooperate, asking the prosecutor to drop the charges.  In September, 2019, the CITY paid $65,000 to Mr. Sebastian to resolve federal civil rights claims.  State tort claims are still pending.

34.     The incidents and investigations cited above, and dozens of others that Plaintiff is prepared to prove, establish the CITY'S knowledge of ORTIZ'S widespread pattern of civil rights violations, abusive treatment of citizens, and his commission of criminal acts.

35.     The incidents and investigations cited above, and dozens of others that the Plaintiff is prepared to prove, establish the CITY'S knowledge that ORTIZ routinely and continuously usurps the authority of the CITY to violate its policies and procedures, rights, and laws (including criminal offenses).

36.     The incidents and investigations cited above, and dozens of others that the Plaintiff is prepared to prove, establish that the CITY has adopted a policy, custom, or practice of deliberate indifference to ORTIZ'S routine and continuous usurpation of

the authority of the CITY to violate its policies and procedures, rights, and laws (including criminal offenses).

37.    On or about December 9, 2017, Plaintiff, MELISSA LOPEZ, was attending the Art Basel Art Festival with her boyfriend. LOPEZ was standing on one side of the street using her cellular telephone to check the festival's event schedule when she noticed her boyfriend on the other side of the street being taken into custody by City of Miami Police.  As part of the festivities, the promotors placed spray paint cans around the neighborhood intending that the public use them to paint graffiti in designated areas (the Miami-Dade State Attorney's Officer late dropped the charges.)

38.    Noticing what was happening, LOPEZ began to cross the street and stated, "Oh my goodness, what happened?"

39.    At no time or in any way as she entered the roadway and began to cross did LOPEZ do or say anything to indicate she intended to interfere or obstruct the arrest. She simply took several steps and asked what happened.

40.    ORTIZ, without warning or cause, rushed into the street toward LOPEZ and viciously pushed her with such force that she fell to the ground causing a fracture to her left wrist.

41.    To cover up the assault, ORTIZ then arrested LOPEZ for obstructing police and resisting arrest without violence.

42.    In a further attempt to cover up the assault, ORTIZ then failed to submit the required Response to Resistance Report to be used by all CITY police department officers who use force.

43.    The force used by ORTIZ, even if his intent was to effect an arrest, was

gratuitous and unnecessary in the that the offence was slight and at no time did LOPEZ offer resistance or attempt to flee.

44.     Even if the arrest had been lawful, the force ORTIZ used was disproportionate to the circumstances and greater than *de minimis*.  LOPEZ never made it more than a few steps into the street and did not approach the area where her boyfriend was placed in custody. Moreover, her boyfriend was compliant, unresisting, and arrested without incident; therefore, there was no heightened concern for any officer's safety, or that of any other person in the area.

45.     The injuries to LOPEZ are permanent in nature, and she continues to suffer pain in her left wrist and continues to suffer emotional pain and suffering caused by the unlawful actions of ORTIZ.

46.     LOPEZ was forced to seek medical care and treatment for her left wrist fracture.

47.     During the course of ORTIZ'S employment with the CITY, the CITY became aware, or should have become aware, of information indicating that ORTIZ was unable and/or unwilling to follow orders and departmental policies, and unfit to serve as a police officer charged with the responsibility of upholding rights and laws.

48.     During the course of ORTIZ'S employment with the CITY, the CITY became aware, or should have become aware, of information indicating that ORTIZ was using the authority conferred upon him for his own personal predilections, to satisfy his own violent impulses by assaulting citizens.

49.     To enable ORTIZ to continue this abuse, the CITY adopted a policy that overlooked and ignored all violations of departmental policies, rights and laws by Ortiz permitting him to avoid supervision, discipline, or termination.

50.      Prior to December 9, 2017, ORTIZ had been:

 a.     the subject of 61 or more citizen complaints filed with the CITY accusing him of unconstitutional use of force, false arrest, abusive treatment, discourtesy, bigoted language, intimidation, reckless driving, and criminal offenses; once having been relieved of duty after a citizen obtained a judicial restraining order; and

 b.     investigated at least 42 times for unlawful use of force specifically;

 c.     placed on a "Monitoring List" maintained by the CIP for City of Miami Police officers, which lists officers who demonstrate a pattern of unconstitutional and unlawful misconduct.

51.     As a direct and proximate result of the acts of CITY and ORTIZ, LOPEZ suffered damages, including the following:

 a.     fracture of her left wrist, causing severe pain and suffering;

 b.     emotional distress and mental anguish; and

 c.     financial damage caused by having to seek medical care and treatment for her left wrist fracture.

52.     ORTIZ is subject to punitive damages for his conduct.

53.     LOPEZ has retained the services of the undersigned counsel and  is obligated to pay a reasonable fee for their services in the event of recovery.

**FEDERAL CLAIMS**

**COUNT I**
**FOURTH AMENDMENT - 42 U.S.C. §1983**
**EXCESSIVE USE OF FORCE**
**DEFENDANT, JAVIER ORTIZ**

54.    LOPEZ realleges and re-avers each and every allegation contained in paragraphs 1 through 4, 6 through 33, and 37 through 53 (and subparts) as if fully set forth herein.

55.    LOPEZ was physically assaulted and battered by ORTIZ, who while acting under color of law violently pushed LOPEZ to the ground in a manner specifically intending to cause her significant pain and discomfort.

56.    ORTIZ attacked LOPEZ for no legitimate law enforcement purpose, usurping the authority of the CITY for his own malign purposes, and consistent with his long history of similar usurpation of that authority.

57.    By doing so, ORTIZ caused LOPEZ to sustain a left wrist fracture, leaving her with a severe injury.

58.    At no time during the events giving rise to this action did LOPEZ commit any act, motion or gesture, or make any statement, to oppose any member of the Miami Police Department, or any police officer, or any other person, that might reasonably have been interpreted or perceived as a threat to their safety, health or wellbeing.

59.    The extent of force used by ORTIZ was far more than *de minimus,* it was excessive and objectively unreasonable, and/or done with the malicious intent to injure LOPEZ.

60.    As a direct and proximate result of the force used by ORTIZ in viciously shoving LOPEZ to the ground, LOPEZ suffered extreme pain and suffering, as well as

17

temporary and/or permanent physical injury, emotional distress, mental anguish, and financial loss.  These injuries are continuing and permanent in nature.

**WHEREFORE**, the Plaintiff, MELISSA LOPEZ, seeks entry of this Court's order of final judgment against the Defendant, JAVIER ORTIZ, for all compensatory and punitive damages incurred, attorney's fees, costs, and such other relief that the Court deems just and proper.

**COUNT II**
**42 U.S.C. §1983 *MONELL* CLAIM**
**DEFENDANT, CITY OF MIAMI**

61.     LOPEZ realleges and reavers each and every allegation contained in paragraphs 1 through 5, and 7 through 53 above, as if fully set forth herein.

62.     CITY confers upon its police officers authority to, among other things, issue lawful commands, effectuate arrests, and exercise control of the persons arrested.  As such, CITY had a legal duty to:

> a.   thoroughly and impartially investigate allegations of misconduct against Ortiz;
>
> b.   appropriately discipline, supervise, retrain, or terminate officers like ORTIZ, who are unable or unwilling to respect the constitutional rights of individuals and who violate rights, laws and department policy;
>
> c.   prevent police officers, like ORTIZ, who are unable or unwilling to respect the constitutional rights of individuals, laws and rules and regulations, from usurping police authority; and
>
> d.   prevent constitutional deprivations that constitute widespread abuse.

63.     By December of 2017, CITY knew, or should have known, that supervision, re-training, discipline, or even termination of ORTIZ was necessary to protect the citizenry from his continuous pattern of rights and law violations.

64.     Nonetheless, CITY failed to act and instead, adopted a policy, custom, or practice of deliberate indifference, ignoring ORTIZ'S misconduct and conducting investigations of allegations against Ortiz in a biased and predetermined manner intended to protect ORTIZ from discipline or termination.

65.     This adopted policy, custom, or practice provided Ortiz with comfort and assurance that he could violate rights and laws without fear of discipline or negative consequences to his employment.

66.     It was this adopted policy, custom, or practice that resulted in ORTIZ assaulting LOPEZ, causing her injury.

67.     CITY'S deliberate indifference to the years' long record of malign conduct by ORTIZ was the moving force which caused LOPEZ to be injured on December 9, 2017.

68.     As a direct and proximate result of the CITY'S acts and omissions as set forth herein, ORTIZ engaged in a widespread pattern of abuse causing the deprivation of LOPEZ'S civil rights, and as a result she suffered pain and suffering, physical and emotional injury, and financial injury.  These injuries are continuing and permanent in nature.

**WHEREFORE,** the Plaintiff, MELISSA LOPEZ, demands judgment against the Defendant, CITY OF MIAMI, for compensatory damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. §1988, and for such other and further relief as the Court deems just and appropriate.

**STATE CLAIMS**

**COUNT III**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**STATE TORT CLAIM**
**DEFENDANT, JAVIER ORTIZ**

69.  LOPEZ realleges and reavers each and every allegation contained in paragraphs 1 through 4, 6 through 33, and 37 through 53 (and subparts), as if fully set forth herein.

70.  The actions of ORTIZ in violently pushing LOPEZ to the ground were intended to cause physical and emotional pain and anguish.

71.  For his own personal gratification, ORTIZ corruptly and unlawfully usurped the authority granted to him by the CITY to assault LOPEZ.  As such, his actions were beyond all bounds of decency, atrocious, and are utterly intolerable in a civilized society, and would cause a reasonable person to cry, "Outrageous!"

72.  ORTIZ'S assault of LOPEZ was not only tortious, it was egregious under the circumstances, and malicious and criminal.

73.  As a direct and proximate result of ORTIZ'S assault, LOPEZ suffered a fractured wrist, as well as emotional injury.  These injuries cause continuing pain and suffering and are likely to continue into the future.

**WHEREFORE,** the Plaintiff, MELISSA LOPEZ, seeks entry of this Court's order of final judgment against the Defendant, JAVIER ORTIZ, for compensatory damages, punitive damages, costs, and for such other relief that the Court deems just and appropriate.

## COUNT IV
## ASSAULT AND/OR BATTERY
## STATE TORT CLAIM
## DEFENDANT, JAVIER ORTIZ

74.     LOPEZ realleges and re-avers each and every allegation contained in paragraphs 1 through 4, 6 through 33, and 37 through 53 (and subparts), as if fully set forth herein.

75.     On or about December 9, 2017, ORTIZ charged at LOPEZ and did touch or strike her in an offensive manner against her will, which was specifically intended to cause significant pain and discomfort.

76.     Notwithstanding any claim to the legality of LOPEZ'S arrest itself, this touching or striking was not within the scope of his lawful duties, as the manner in which ORTIZ pushed LOPEZ was intended as punishment and not for restraint purposes.

77.     In doing so, ORTIZ caused LOPEZ to violently strike the ground fracturing her left wrist.

78.     As a direct and proximate result of the force used by ORTIZ, LOPEZ suffered extreme pain and suffering, as well as temporary and/or permanent physical injury, and financial loss.  The conduct of ORTIZ was willful and wanton and done with reckless disregard for LOPEZ'S rights.  These injuries are continuing and permanent in nature.

**WHEREFORE**, the Plaintiff MELISSA LOPEZ seeks entry of this Court's order of final judgment against the Defendant, JAVIER ORTIZ, for all compensatory damages incurred, punitive damages, attorney's fees, costs, and for such other relief that the Court deems just and appropriate.

**COUNT V**
***RESPONDEAT SUPERIOR* LIABILITY CLAIM**
**DEFENDANT, CITY OF MIAMI**

79.     LOPEZ realleges and reavers each and every allegation contained in paragraphs 1 through 5, and 7 through 53 above, as if fully set forth herein.

80.     Subject to certain statutory limitations, the CITY is liable for the negligent and/or wrongful acts or omissions of its employees while acting within the scope of their office or employment to the same extent as a private employer.

81.     One statutory limitation on imposing *respondeat superior* liability on the CITY is that it "shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the scope of her or his employment or committed in bad faith or with malicious purpose or in a manner exhibiting willful and wanton disregard of human rights, safety, or property."

82.     As permitted by Rule 8(d), Fed.R.Civ.P., in the alternative to the contrary allegations set forth in this Complaint, LOPEZ alleges that ORTIZ was acting within the scope of his employment, not usurping the authority conferred upon him, and did not commit the above-mentioned torts of assault, battery, infliction of emotional distress, or negligence in bad faith or with malicious purpose, or in a manner exhibiting willful and wanton disregard of human rights, safety, or property.  Accordingly, *respondeat superior* liability ought to be imposed on the CITY for ORTIZ'S acts of battery, and negligence to the extent provided by law.

83.     As a direct and proximate cause of ORTIZ'S negligent conduct, LOPEZ has suffered pain and suffering, physical and emotional injury, and financial loss.  These injuries are continuing and permanent in nature.

22

**WHEREFORE,** the Plaintiff, MELISSA LOPEZ, seeks judgment against the Defendant, CITY OF MIAMI, for compensatory damages, costs, and for such other and further relief the Court deems just and appropriate.

**COUNT VI**
**NEGLIGENT SUPERVISION CLAIM**
**DEFENDANT, CITY OF MIAMI**

84.     LOPEZ realleges and reavers each and every allegation contained in paragraphs 1 through 5, and 7 through 53 above, as if fully set forth herein.

85.     At all times material hereto, the CITY knew or should have known that ORTIZ was engaged in a pattern of conduct outside the scope of his employment, intended to satisfy his own violent impulses.

86.     Having granted ORTIZ the apparent authority to exercise the power of arrest, the CITY had a duty to reasonably ensure that he did not usurp that authority for his own personal desires and impulses.

87.     The CITY breached that duty, adopting a policy, custom, or practice intended to protect ORTIZ from meaningful supervision that would have curtailed and controlled his penchant for committing acts of violence against the citizenry.

88.     This policy, custom, or practice was intended to tolerate all of ORTIZ'S violations of written policies, rights and laws – of any nature – by overlooking incidents which called for greater supervision or immediate remedial measures.

89.     The CITY either completely ignored such violations by ORTIZ or conducted sham investigations to protect ORTIZ.

90.     On December 9, 2017, this policy, practice, or custom of toleration and accommodation resulted in ORTIZ wrongfully   injury.

91.     Based on the obvious need for supervision demonstrated by a widespread and longstanding pattern of ORTIZ using unnecessary and gratuitous force – assaulting people to satisfy his own violent impulses – the CITY knew or should have known that further such incidents, including the assault of LOPEZ, were foreseeable.

92.     As a direct and proximate result of the CITY'S failure to adequately supervise ORTIZ, despite the foreseeable consequences of rights violations, LOPEZ has suffered pain and suffering, physical and emotional injury, and financial loss.   These injuries are continuing and permanent in nature.

**WHEREFORE,** the Plaintiff, MELISSA LOPEZ, seeks order of the Court for final judgment awarding her compensatory damages, costs, and for such other and further relief as the Court may deem just and appropriate.

### COUNT VIII
### NEGLIGENT RETENTION CLAIM
### VERSUS DEFENDANTS, CITY OF MIAMI

93.     LOPEZ realleges and reavers each and every allegation contained in paragraphs 1 through 5, and 7 through 53 above, as if fully set forth herein.

94.     At all times material hereto, CITY knew or should have known that ORTIZ was engaged in a pattern of conduct outside the scope of his employment, intended to satisfy his own violent impulses.

95.     Having granted ORTIZ the apparent authority to exercise the power of arrest, the CITY had a duty to reasonably ensure that he did not usurp that authority for his own personal desires and impulses.

96.     The CITY breached that duty, adopting a policy, custom, or practice intended to protect ORTIZ from termination of his employment that would have curtailed and controlled his penchant for committing acts of violence against the citizenry.

97.     This policy, custom, or practice was intended to tolerate all of ORTIZ'S violations of written policies, rights and laws – of any nature – by overlooking incidents which called for termination of his employment.

98.     The CITY either completely ignored such violations by ORTIZ or conducted sham investigations to protect ORTIZ.   However, the CITY knew, or should have known, that ORTIZ was incapable of controlling his violent impulses or abiding written policies, rights, and laws.

99.     On December 9, 2017, this policy, practice, or custom of toleration and accommodation resulted in ORTIZ wrongfully injuring LOPEZ, causing serious bodily injury.

100.     Based on the obvious need for termination demonstrated by a widespread and longstanding pattern of ORTIZ using unnecessary and gratuitous force (assaulting people to satisfy his own violent impulses), the CITY knew or should have known that further such incidents, including the assault of LOPEZ, were foreseeable.

101.     As a direct and proximate result of the CITY'S failure to terminate ORTIZ, and despite the foreseeable consequences if he was retained, LOPEZ has suffered pain and suffering, physical and emotional injury, and financial loss.   These injuries are continuing and permanent in nature.

**WHEREFORE,** the Plaintiff, MELISSA LOPEZ, seeks order of the Court for final judgment awarding her compensatory damages, costs, and for such other and further relief as the Court may deem just and appropriate.

### DEMAND FOR JURY TRIAL

The Plaintiff, MELISSA LOPEZ, demands trial by jury of all issues so triable as of right by jury.

DATED this 30th day of March, 2020.

s/ *David A. Frankel*
DAVID A. FRANKEL
**Law Offices of David A. Frankel, P.A.**
Attorneys for Plaintiff
4601 Sheridan Street, Suite 213
Hollywood, FL  33021
(954) 683-0300
FLA. BAR NO.  741779
david@BlueLotusLaw.com
Service@BlueLotusLaw.com